UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FUNDS IN THE AMOUNT OF | ) |
| APPROXIMATELY $45,016,728.78 | ) |
| SEIZED FROM BANK OF AMERICA | ) |
| ACCOUNT IN THE NAME OF AL- | ) |
| AMEER TESTING INC. | ) |
| XXXXXXXX9668; | ) |
| | ) |
| FUNDS IN THE AMOUNT OF | ) |
| APPROXIMATELY $3,044,710 SEIZED | ) |
| FROM BANK OF AMERICA ACCOUNT | ) |
| IN THE NAME OF AL-AMEER | ) |
| TESTING CENTER INC. | ) |
| XXXXXXXX4599; | ) |
| | ) |
| | ) |
| Defendants. | ) |

## **VERIFIED COMPLAINT FOR FORFEITURE**

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant properties, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

## Nature of the Action

1.      This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2.      This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3.      This complaint is verified by the attached Verification of Ellen Diamond, Federal Bureau of Investigation ("FBI") Special Agent ("SA Diamond"), which is fully incorporated herein.

## The Defendant *in rem*

4.      The defendant *in rem* consists of the following property:

> (a) Funds in the amount of approximately $45,016,728.78 seized from Bank of America account in the name of Al-Ameer Testing Inc. XXXXXXXX9668 (**Al-Ameer Account 1**); and

> (b) Funds in the amount of approximately $3,044,710 seized from Bank of America account in the name of Al-Ameer Testing Center Inc. XXXXXXXX4599 (**Al-Ameer Account 2**);

5.      The defendant properties were seized between on or about June 16, 2023, and June 23, 2023.

6.      The defendant properties are currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

7.    This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8.    This Court has *in rem* jurisdiction over the defendant properties pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9.    Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395(b)(1)(A) because acts giving rise to this action occurred in this district.

## Statutory Basis for Forfeiture

10.    The defendant properties are subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or any property traceable to such property. The defendant properties are further subject to forfeit pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1347, 1349, or 1957.

## Specific Allegations

I.    **Background**

A.    **Al-Ameer Testing Center, Inc.**

11.     According to records maintained by the Illinois Secretary of State: (i) Al-Ameer Testing Center, Inc. ("Al-Ameer") was incorporated in Illinois on February 9, 2022, by Murtuza H. Syed ("Syed") ; and (ii) on or about February 14, 2023, an annual report for Al-Ameer was filed identifying Syed as its registered agent, and Ahmed Agha ("Agha") as its President and Secretary. On or about April 4, 2023, a change of agent was registered with the Illinois Secretary of State, and its records now identify Hasan Ali Mirza Mohammed ("Mohammed") as the registered agent, President, and Secretary of Al-Ameer.

12.     According to the Medicare Provider Enrollment, Chain, and Ownership System (PECOS), Al-Ameer is a registered provider with Medicare. Syed is the "Authorized Official," "Contracted Managing Employee," and "5% or Greater Direct/Indirect Owner" of Al-Ameer. As part of PECOS, there is an electronic funds transfer (EFT) agreement between Al-Ameer and Medicare. According to the EFT agreement, Medicare monies for claim reimbursement by Al-Ameer were to be electronically deposited into **Al-Ameer Account 1** starting approximately on or about August 21, 2022.

**B.     Medicare Program**

13.     Medicare is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65

with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

14.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

15.     Medicare, as well as private health care benefit programs are "health care benefit programs" as defined by Title 18, United States Code, § 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual…" 18 U.S.C. § 24(b).

16.     Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

17.     Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient. Health care suppliers, like Al-AMEER Testing Center, are paid by Medicare through the submission of claims.

All Medicare providers are required to submit claims electronically. Those claims are processed through Baltimore, Maryland, and therefore they travel in interstate commerce. Medicare reimburses claims electronically, as well, and payments for Medicare Part A services in Illinois are issued from National Government Services, a Medicare Administrative Contractor headquartered in Indianapolis, Indiana. Payments are made into a provider's bank account through an electronic funds transfer. Providers are also required to maintain all documents that substantiate Medicare claims for at least six years.

18.     Until September 12, 2023, Al-Ameer was actively enrolled with Medicare. Therefore, at all relevant times, Al-Ameer was bound by the laws, rules, and regulations that govern Medicare.

19.     As of September 12, 2023, Medicare revoked Al-Ameer's ability to participate in the Medicare program and placed them on a three year suspension from the program.

**C.     Over-the-Counter ("OTC") COVID-19 Test Kits**

20.     In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC COVID-19 tests per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC COVID-19 tests per month at no cost to beneficiaries.

21.     To receive reimbursement from Medicare for the OTC COVID-19 tests,

providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034. CMS's guidance to providers billing for these OTC COVID-19 tests is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."

## II.    Facts Establishing Basis for Forfeiture

22.    Al-Ameer obtained the funds in **Al-Ameer Account 1** and **Al-Ameer Account 2** through the Medicare program by billing Medicare fraudulently for reimbursement for (1) OTC COVID-19 tests for patients who never received the OTC COVID-19 tests and (2) for patients who did not agree to or approve the delivery of OTC COVID-19 tests to their home.

### A.    Analysis of Medicare Claims Data

23.    Beginning on or about April 3, 2023, despite never having done so before, Al-Ameer billed Medicare almost exclusively for HCPCS Code K1034 at extraordinarily high rates. As indicated above, this is the billing code applicable for reimbursement of delivery of OTC COVID-19 test kits to Medicare beneficiaries.

24.    Al-Ameer's billings for HCPCS Code K1034 were submitted to Medicare during a very short period of time and were extraordinarily high.

25.    During less than two weeks, from approximately April 3, 2023, through June 1, 2023, Al-Ameer sought payments totaling approximately $76,286,520, and

was paid $58,277,468 by Medicare. During this time, Al-Ameer billed Medicare for shipping OTC COVID-19 test kits to 585,148 different Medicare beneficiaries for a total of 636,643 claims.

26.     Medicare claims data also demonstrates an extraordinarily unusual rate of back billing.

27.     For example, Al-Ameer billed Medicare on May 8, 2023, May 10, 2023, May 11, 2023, and May 12, 2023, for OTC COVID-19 test kits allegedly shipped to Medicare beneficiaries from approximately July 2022 through September 2022.

28.     For these four days, Al-Ameer billed Medicare approximately $52,277,160 for 3,485,144 test kits shipped to 435,643 beneficiaries.

29.     Billing Medicare eight to ten months after the purported date of service for such a large number of beneficiaries is exceedingly uncommon and indicative of fraud.

**B.     Al-Ameer Site Visit**

30.     On May 18, 2023, law enforcement agent conducted a site visit at the practice location for Al-Ameer. The agent observed an empty storefront in a single-story strip mall between a dry cleaner and a laundromat. The door bore a sign indicating the office was open, but otherwise gave no indication that a laboratory or OTC COVID-19 test kit supplier conducted business at the location. There was no signage naming Al-Ameer as the occupant of the location.

31.     The agent took the photograph below of the exterior of Al-Ameer's practice location on May 18, 2023.



32.     Further examination by the agent of the interior revealed what appeared to be an abandoned office with a single bare desk and no individuals present in the space despite the signage indicating the location was open.

33.     The photograph below of the interior of the Al-Ameer practice location was taken by the agent on May 18, 2023.



34.     Although the practice location of Al-Ameer appeared abandoned on May 18, 2023, Al-Ameer continued to bill Medicare for shipment of OTC COVID-19 test kits.

35.     From May 19, 2023 through June 5, 2023, Al-Ameer submitted claims for HCPCS Code K1034 on approximately 4,375 unique claims totaling approximately $525,000.

10

### C.      Medicare Beneficiary Complaints

36.      Since on or about April 15, 2023, shortly after Al-Ameer began submitting claims to Medicare for HCPCS Code K1034, Medicare beneficiaries have submitted an extraordinary number of complaints to the government relating to Al-Ameer.

37.      Between approximately April 15, 2023, and November 15, 2023, Medicare received 33,539 complaints from Medicare beneficiaries regarding Al-Ameer.

38.      Although investigators have not yet interviewed all of the beneficiaries, the complaints have been preliminarily reviewed and categorized by the government.

39.      14,461 of the complaints have been categorized as "Did Not Receive Services," and 957 of the complaints have been categorized as "Suspect Identity Theft."

40.      Law enforcement agents have begun to interview Medicare beneficiaries who have lodged complaints relating to Al-Ameer.

41.      For example, between approximately May 31, 2023, and June 5, 2023, law enforcement agents interviewed 7 individuals who reported that Al-Ameer had billed Medicare using his/her name for shipment of OTC COVID-19 test kits that were purportedly delivered to them. All 7 individuals reported to the interviewing agent that they had never received or requested a COVID-19 test kit from Al-Ameer.

### D.      Billing for Deceased Beneficiaries

42.      As of June 2023, Al-Ameer attempted to bill Medicare for 61 claims for

purportedly supplying OTC COVID-19 test kits on a date after the beneficiary's date of death. In other words, the date of service according to the claim submitted by Al-Ameer, purportedly the date the test kits were sent or delivered, occurred after the reported death of the Medicare beneficiary.

43.     For example, Al-Ameer submitted a claim under procedure code K1034 with a purported date of service of March 22, 2023, for a test kit allegedly delivered to Medicare beneficiary N.L. According to Medicare data, however, Medicare beneficiary N.L. died on July 22, 2020.

44.     As another example, Al-Ameer submitted a claim under procedure code K1034 with a purported date of service of March 23, 2023, for a test kit allegedly delivered to Medicare beneficiary R.L. According to Medicare data, however, Medicare beneficiary R.L. died on January 12, 2021.

45.     Medicare providers who repeatedly bill for services purportedly delivered to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of the provision of bona fide services to beneficiaries.

**E.     Lack of Identifiable Business Expenses**

46.     Based upon review of bank records for **Al-Ameer Account 1**, there is no indication that Al-Ameer had business expenses that one would expect for a company that delivered hundreds of thousands of OTC COVID-19 test kits to hundreds of thousands of Medicare beneficiaries.

47.     From January 3, 2022, until April 19, 2023 (the day Al-Ameer began

receiving reimbursements from Medicare for thousands of K1034 claims), a total of approximately $38,888 was withdrawn from **Al-Ameer Account 1**.

48.     The majority of the withdrawals from **Al-Ameer Account 1** were Zelle transfers to Syed or his family members, which totaled approximately $22,720.

49.     During that time period, there is no evidence of payment for the regular and sizeable expenses that one would expect for a business operating as a large scale provider of COVID-19 test kits to Medicare beneficiaries, such as for payroll (or to a payroll service provider); for COVID-19 test kits; for shipping, postage, or packaging; or payments to Medicare billers, from **Al-Ameer Account 1** or from any other financial account that the government has identified associated with Al-Ameer.

**F.      Tracing the Funds Sought for Forfeiture**

50.     According to Bank of America records, **Al-Ameer Account 1** was opened on or about February 25, 2022, by Syed. **Al-Ameer Account 2** was opened at Bank of America on or about May 9, 2023, by Mohammed.

51.     The funds sought for forfeiture in **Al-Ameer Account 1** were obtained from Medicare and represent the proceeds of billing Medicare fraudulently for purported delivery of OTC COVID-19 test kits.

52.     The funds sought for forfeiture in **Al-Ameer Account 2** represent the proceeds of billing Medicare fraudulently for purported delivery of OTC COVID-19 test kits.

53.     These funds were initially deposited into **Al-Ameer Account 1** and were then transferred directly to **Al-Ameer Account 2** as follows: funds totaling

approximately $1.8 million were transferred on or about May 3, 2023, the same day that **Al-Amer Account 2** was opened; and approximately $3 million were transferred on or about May 18, 2023.

54. **Al-Ameer Account 1** and **Al-Ameer Account 2** were frozen by Bank of America on or about June 5, 2023, prior to the bank's receipt of seizure warrants issued by magistrate judges in the Northern District of Illinois.

**G. Interviews**

55. Mohammed and Agha have not been interviewed by the government. Both left the United States on outbound flights from O'Hare International Airport on or about June 8, 2023 (Agha), and June 9, 2023, (Mohammed).

56. Syed was interviewed by the government. Among other things, Syed stated he was the owner of Al-Ameer until February 20, 2023, when he sold it to Agha for $10,000. Syed learned from Agha approximately 15 days later that Agha had sold Al-Ameer to Mohammed. At the request of Agha, Syed met Mohammed at Bank of America and transferred the Al-Ameer corporate bank accounts to Mohammed.

## Conclusion

60. For the reasons stated herein and in the attached affidavit, incorporated by reference herein, the foregoing defendant properties were involved in a transaction or attempted transaction in violation of section 1957, or is property traceable to such property, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(A). Furthermore, the foregoing defendant properties were derived from proceeds traceable to violations of Title 18, United

States Code, Sections 1341, 1343, 1347, 1349, or 1957, and therefore are subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1)     That process issue for arrest warrants *in rem* for the defendant properties, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2)     That due notice be given to all parties to appear and show cause why forfeiture of the defendant properties to the United States in accordance with the claims herein set forth should not be decreed;

3)     That this Court enter a judgment of forfeiture for the defendant properties to the United States; and

4)     That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By:    */s/ Brian Hayes*
BRIAN HAYES
Assistant United States Attorneys
219 South Dearborn., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated:    December 13, 2023

NORTHERN DISTRIT OF ILLINOIS )
                                   )        SS

COUNTY OF COOK              )

<u>AFFIDAVIT</u>

I, Ellen Diamond, being duly sworn, upon oath, depose and state as follows:

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. My duties and responsibilities as a Special Agent with FBI include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code 1347 (health care fraud) and Title 18, United States Code 1349 (conspiracy to commit health care fraud). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests. I am a graduate of the Federal Bureau of Investigation Special Agent Basic Training Program and Asset Forfeiture and Money Laundering Financial Investigation Seminar.

2.       I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

3.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12|13|2023

*Ellen Diamond*

ELLEN DIAMOND, Special Agent
Federal Bureau of Investigation

2